## Philbin, et al. v. Creasey Corporation.

(Decided June 19, 1925.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Third Division).

1. Pleading—Original Contract Attached to Petition Would Prevail Over Averments at Variance Therewith.—In suit for damages for breach of contract, original contract, which was attached to and made a part of petition, would prevail over averments thereof with which it was at variance.

2. Brokers—Contract Authorizing Plaintiff to Sell Stock, and Service Contracts of Grocery Corporation, Construed.—Contract authorizing plaintiff to sell stock and service contracts of wholesale grocery corporation in units of three shares, at a price of $325.00. with first payment of $65.00, held not to authorize sale of $1,000,-000.00 worth of stock to concern not engaged in grocery business, at $88.33 1/3 per share, having par value of $100, on initial payment of $5.00 a share, even though corporation would realize amount specified in contract.

3. Brokers—Stock Presumed Not to be Dividend Bearing, in Absence of Averment to That Effffect.—In absence of an averment that stock which plaintiff was authorized to sell would earn a dividend, or that prospects of dividends gave stock a value greater than it would otherwise have, or in any way added to its marketable qualities, presumption would be that stock was not dividend bearing, or at least there would be no presumption that it was dividend bearing.

4. Pleading—Pleadings Must be Construed Strongest Against Pleader.—Pleadings must be construed strongest against pleader.

5. Brokers—Contract Authorizing Plaintiff to Sell Stock Held Not Breached by Corporation's Issuance of Notes.—Contract authorizing plaintiff to sell stock and service contract of wholesale grocery corporation held not breached because corporation issued notes to be paid out of savings effected through discount of bills, which, it was claimed, render stock not dividend bearing.

BRUCE, BULLITT & GORDON for appellants.

WOODWARD & WARFIELD for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

A general demurrer was sustained to the petition of appellants, Philbin and Commonwealth Sales Company, by the lower court, and this appeal is prosecuted from judgment entered thereon, dismissing the cause when the plaintiffs, now appellants, declined to further

plead. The appellant, Commonwealth Sales Company, is a Kentucky corporation, of which Thomas E. Philbin is the president, with offices in Louisville, and the Creasey Corporation was organized under the laws of the state of Delaware with a capitalization of three million dollars, and at the time of the happening of the things hereinafter mentioned it had and now has its chief office and principal place of business in Louisville, and it is engaged in the wholesale grocery business with many branch stores. In May, 1922, the Creasey Corporation entered into a written contract with appellant, Philbin, whereby it gave him the exclusive right to sell its unsold capital stock, bonds, securities and service contracts, which in part reads:

"In consideration of the services, promises and agreement of said second party hereinafter set out, agrees to grant to and does hereby grant to said second party the exclusive right to the sale of its shares of capital stock and its service contracts, and to the sale of the unsold shares of capital stock of corporations now controlled by it or hereafter to be controlled and to the sale of service contracts of corporations now controlled by it or hereafter to be controlled, and grants said second party the exclusive control of the sale of all such shares of stock and all of such service contracts and binds itself and its subsidiaries not to sell any shares of stock or any service contracts except through said second party or his assigns.

"It is mutually agreed that said second party shall sell the shares of stock of the first party or its subsidiaries in blocks of three shares or in blocks equal in part value to the sum of three hundred ($300.00) dollars or service contracts of the minimum value of three hundred ($300.00) dollars all of said blocks of shares of stock and service contracts, for the present, to be sold for the sum of three hundred and twenty-five ($325.00) dollars."

For making the sales Philbin was to have a commission, and this is set out in the contract in the following paragraph:

"In consideration of the premises and the services to be performed by said second party the party

of the first part agrees to pay the said second party the sum of fifty-five ($55.00) dollars out of each and every first payment of sixty-five ($65.00) dollars secured as herein set out and the further net commission of twenty ($20.00) dollars on the payment of the first note of thirty-two and 50/100 ($32.50) dollars.''

The contract further says:

''The said second party agrees to faithfully, diligently and vigorously represent and push the sale of the capital stock of the said first party or any of its subsidiaries and the service contracts of said party and its subsidiaries and to organize and maintain a sales organization to promote the sale of such stock and such contracts, and said second party further guarantees to the said first party to sell during the five years' period of this contract a minimum of five thousand blocks of each of three shares of stock and service contracts combined, and further guarantees to said first party to sell during each year of the period of this contract a minimum of one thousand of such contracts combined, and nothing in this clause shall be so construed as to prevent the said second party from selling more than one thousand contracts during the five-year period of this contract. . . .

''It is further covenanted and agreed that the said first party shall furnish to the said second party adequate office space at its main office at Louisville, Kentucky, and at any of its existing branches and at any branch hereafter organized or opened, and at the office of any subsidiary corporation and any branch of any subsidiary corporation now existing or hereafter organized and controlled by said first party, which said office space to be so furnished for the convenience of said second party, his salesmen and employes, without expense to said second party.

''It is further mutually covenanted and agreed between the parties hereto that the said second party shall have the right to assign or sell this contract to a third party, which may either be an individual or a corporation capable of performing this contract, and in the event that this contract is so sold or assigned said third party shall enjoy all the rights

and privileges and be bound by all of the recitals, terms and agreements of this contract.

"It is further mutually agreed that this contract shall continue and remain in full force and effect for a term of five (5) years from May 1, 1922, unless terminated by agreement of the parties prior to said time."

Very soon after the execution of the contract Philbin assigned it in writing to appellant, Commonwealth Sales Company, and through it undertook to carry out its terms. After making sales of stock and service contracts appellants ceased to prosecute the work and soon thereafter instituted this action against the Creasy Corporation to recover $100,000.00 as damages for its breach, alleging the execution of the contract and its terms, and averring breach thereof, as follows:

"Plaintiffs state that immediately upon the execution of the contract aforesaid, plaintiffs proceeded faithfully, diligently and vigorously to push the sale of the capital stock and service contracts of the defendant and to organize and maintain a sales organization to promote the sale of such stock and contracts, and that they did effect the sale of a large number of blocks of stock and of a large number of service contracts.

"Plaintiffs state that they did effect an arrangement for the sale of $1,000,000.00 in par value stock of defendant in blocks of $200,000.00 in par value at intervals of three months beginning June 20, 1922, and that a part of the stock subscriptions therefor were accepted by the defendant, but that defendant suddenly and without justification notified plaintiffs that they would no longer accept stock subscriptions under that arrangement and refused to permit it to be carried out, and demanded of plaintiffs that they discontinue such sale of said stock. They state that defendant thereby violated the obligation of its contract, and thereby prevented plaintiffs from consummating the sale of said stock, which would have been consummated by plaintiffs but for the action of defendants in preventing its consummation, and thereby defendant has deprived plaintiffs of their commission upon the sale of said stock.

"They state that defendant has further violated the obligation of its contract in that it has authorized the issue and sale of $1,000,000.00 in gold notes of the company, payable in ten (10) years from their date and bearing interest at the rate of 8% per annum, and it has agreed with the holders and purchasers of said notes that it will set aside a sinking fund to be created by revenues derived from the discount of the bills of the defendant; that out of said sinking fund there shall first be paid the interest on said notes and then the principal thereof, and the balance of said sinking fund shall be apportioned ratably among the holders of said notes at the maturity thereof; and defendant has represented and is representing that said sinking fund so created will be sufficient not only to pay the interest on said $1,000,000.00 issue of gold notes, but in addition thereto it will be sufficient to pay to the holders of said notes at the maturity thereof, $190.00 for each $100.00 in principal amount of said notes.

"They state that at the time the contract sued on herein was made, it was not contemplated by the parties that the defendant would authorize or create any securities which would have priority over the common capital stock of the company; and that the issue of said $1,000,000.00 in principal amount of gold notes of the company was conceived by the officers of the company after the defendant had refused to permit plaintiffs to consummate the sale of $1,000,000.00 of the capital stock of the company as aforesaid, and defendant knew that it would, and intended that it should have the effect of rendering it impossible to sell the stock as provided in its said contract with plaintiff, Philbin.

"Plaintiffs state that the creation of the sinking fund from revenues derived from discounts of the bills of the defendant corporation, and the appropriation of said fund for the sole benefit of the note holders deprives the stockholders of a source of revenue that would otherwise inure to their benefit, and greatly diminishes the value of the stock of the corporation and effectually prevents the sale of any stock in the corporation, and they say that by thus preventing the sale of stock in the corporation, the defendant has deprived plaintiffs of their ability

to sell stock under the contract sued on herein and earn their commissions thereon.

"Plaintiffs state that but for the actions of the defendant in refusing to permit plaintiffs to consummate sales of stock made pursuant to the terms of the contract aforesaid, and in rendering it impossible for plaintiffs to sell stock by creating the gold note issue above referred to and thereby depreciating the value of the stock they have made the contract impossible of performance on the part of plaintiffs and it has thereby become valueless.

"Plaintiffs state that but for such actions on the part of the defendant, they could and would have performed all the terms and conditions of their contract and would have earned thereunder at least the sum of one hundred thousand dollars ($100,000.00) over and above all expenses which would have been incurred by them in carrying out their obligations under said contract, and they state that by the violations of the contract upon the part of the defendant aforesaid, they have been damaged in the sum of at least one hundred thousand dollars ($100,000.00)."

A general demurrer was sustained to the petition with leave to amend. The petition was later amended and a general demurrer again interposed. On consideration it was sustained to the petition as amended. The contract was attached to and made a part of the petition.

The sufficiency of the petition as amended to state a cause of action is the sole question we have before us. In sustaining the general demurrer to the petition the learned trial judge, a great jurist and one for whom we have much respect, delivered an opinion in which, after stating the facts, it is said:

"The amount of commission to be paid the plaintiff for the sale of the securities was 23½ per cent on the prices obtained for the stock. Under the terms of the statute such stock and investment securities as are involved in this case are forbidden to be sold on a greater commission than 20 per cent, and a breach of this provision of the law is made a misdemeanor punishable by both fine and imprisonment. On the part of the plaintiff it is conceded that if the contract as made was to be executed in whole or in part in Kentucky it is void because it

violates the provision of the statute above referred to. On the part of the defendant it is conceded that if the contract was to be wholly executed without the state of Kentucky then it is valid, as the statute has no extraterritorial force or effect. There is no disagreement between the court and counsel as to the soundness of the principles of law urged by them on either side, and this condition results in narrowing the question to be solved merely to a conclusion or inference of fact to be drawn from the petition.

"What can the court say on this demurrer as to the territory in which the contract was to be executed? I agree with counsel for plaintiff that no presumption should be unnecessarily indulged that the contracting parties meant to violate the law; so that if, on the face of the petition and the contract filed as an exhibit, there is no evidence that the stock was to be sold in Kentucky, then the demurrer must be overruled; but, on the other hand, we must try and place ourselves in the shoes of the parties as shown by the pleadings and, giving all legal effect to their words, ascertain if we can exactly what was meant.

"In the first place, the contract confers upon plaintiff the exclusive right or monopoly of selling all the investment securities of the defendant. And this of necessity gives him the exclusive right to sell to the whole world. There is no limitation by the language used of the territory where the purchaser was to be found; nothing that excludes Kentucky from the operation of the selling agency. So far as the contract is concerned, wherever the plaintiff could find a purchaser and sell the stock, he earned his commission. Observe, too, that the contract was made in Kentucky and the principal or home office of the defendant was in Louisville, Kentucky, and the sales agency organized for the purpose of executing the contract was incorporated under the laws of Kentucky.

"It is difficult to understand why the parties should solemnly covenant that the salesman of the plaintiff should have office room or space in the main office of the defendant company at Louisville, Kentucky, if they were not to sell any stock in Kentucky.

It seems to me that the sales agency would want its office space in the territory of its endeavors so that its salesmen could be near the people to whom they proposed to sell the stock. And as the chief value of the stock to the purchaser was to be the privilege of buying goods from the defendant corporation at a discount, it would naturally be expected that the purchasers of stock would be among those who resided nearest to the point where the goods were to be sold. The stock would be of value to the holder in direct ratio to his proximity to the place where he was to purchase his goods, transportation often being one of the controlling factors in the profitable purchase of merchandise; and the fact that the parties thought it necessary to contract for office space for these selling agents shows or tends to show that these sales were to be made in Kentucky. I do not mean to say that any one of the several grounds which I have set out as constituting the basis of my conclusion that this stock was to be sold in Kentucky authorizes this assumption; but, like the multitude of threads with which the pigmy inhabitants of Lilliput sought to bind the limbs of the sleeping Gulliver, while no one of them would for a moment accomplish that purpose, in the aggregate they bound the sleeping giant into harmless immobility. As there, so here. The aggregate of these several considerations irresistibly forces me to the conviction that the parties to the contract in question did not intend to exclude Kentucky from the territory where the stock sales were to be made, and therefore the contract is void as being in contravention of the provisions of the statute above mentioned.

"In conclusion, I am deeply impressed with the narrowness of the issue involved on this demurrer. The petition alleges that about a million dollars of the stock has already been sold by the plaintiff. Both parties necessarily know the residence of these purchasers and whether, as a matter of fact, any of them reside in Kentucky. If the plaintiff's theory of this case is true, five lines of amended petition would give him an impregnable position. If, on the contrary, the defendant's theory be true, ten lines of answer will afford him an efficacious bar to any recovery by plaintiff. The disposition of the parties

to settle this cause on demurrer and not come to grips on the facts might lead an overly suspicious mind to suspect that both sides are disinclined to spread on the record by plea the indubitable fact of the violation of the statute, for the information, perhaps, of some erratic grand jury of the future who might be disposed to inquire too curiously into the matter. But, of course, the court has nothing to do with this phase of the question, being disposed for the present to shelter under the old adage of 'sufficient unto the day is the evil thereof.' ''

After the court sustained the general demurrer to the petition and delivered the foregoing opinion appellants, as plaintiffs, filed an amended petition averring:

"That the sale of the $1,000,000.00 in par value of the capital stock of defendant and the arrangement for such sale, all of which is specifically set out in the original petition herein, were made with a purchaser in the city of Chicago, Illinois, who resided in said city and whose office and place of business was in said city, and that said sale of said stock was not made in Kentucky, nor to a purchaser who was a Kentucky citizen or resident. Plaintiffs file herewith a copy of the contract concerning sale of said stock marked 'Exhibit A.'

"That in addition to said sale of $1,000,000.00 plaintiffs sold approximately $34,000.00 in par value of said stock, of which $34,000.00 in par value of said stock approximately $27,200.00 in par value was sold in the states of Pennsylvania, Ohio, Maryland and West Virginia, and approximately $6,800.00 of the par value was sold in the state of Kentucky.

"That all of the sales made in Kentucky, aggregating approximately $6,800.00 in par value of said stock, as aforesaid, were subsequently rescinded and the purchase money refunded by defendant to the respective purchasers and the sales held for naught, because at the time said sales were made the defendant had failed to comply with the statutes of the state of Kentucky in order to acquire authority to sell, issue and deliver its stock to Kentucky purchasers.''

To the petition as amended was attached as exhibit a written proposal by the Chicago concern to the Com-

monwealth Sales Company to purchase one million dollars, par value, of the treasury shares of the common stock of the Creasey Corporation and it reads, in part, as follows:

"We agree to purchase the said stock in blocks of two hundred thousand dollars of par value at intervals of three months at a price of eighty-eight dollars and thirty-three and one-third ($88.33 1/3) per share, the par value of each share being $100.00.

"We further agree to take up the first such block of two hundred thousand dollars par value or two thousand shares by making payment to you of $5.00 per share, the balance per share to be paid for in cash, or $8.33 1/3 in cash and three notes of $25.00 each payable to the Creasey Corporation, due one each sixty, one hundred and twenty and one hundred and eighty days from date; we may order the delivery of said stock from time to time until September 30th, 1922, at which time we shall have bought from you the first two thousand shares. It being understood that should we fail to take the said first block of two thousand shares herein mentioned or any part thereof, on or before September 30th, 1922, then the payment of $5.00 per share on such part of the two thousand shares as have not been taken up is to be forfeited as damages to you.

"The three notes of $25.00 each, herein mentioned, covering part of the purchase price per share are to be notes of subscribers for the stock through us, and we agree to secure such notes made payable to and subject to the acceptance of the Creasey Corporation.

"The balance of the million dollars of said stock is to be purchased by us, upon the same terms and conditions as the two hundred thousand dollars of par value, which we are agreeing to buy at this time, provided, nevertheless, that if we should fail to carry out our agreement in any way with respect to the first two thousand shares herein mentioned that our option to purchase further stock under this agreement shall immediately become null and void. . . .

"We also agree that the $5.00 per share which we are to advance on the first block of two thousand shares herein mentioned is to be paid as follows: Seven thousand five hundred ($7,500.00) dollars

cash, upon the signing of this contract, and the balance of twenty-five hundred ($2,500.00) dollars on June 30th, 1922, and in the event the last mentioned payment is not made promptly, we are to forfeit as damages the payment of seventy-five hundred ($7,500.00) dollars which we are to make upon signing this contract, this agreement shall become null and void.''

Appellant contends (1) that the contract between them and appellee, Creasey Corporation, was not void but only voidable at the option of appellants and may be enforced by them; (2) that the provisions of section 883e-22a, Kentucky Statutes, expressly apply only to contracts made with reference to sales of securities ''within the Commonwealth of Kentucky,'' and that the provisions of that statute can have no extraterritorial effect; (3) that the laws of other states, in the absence of pleading and proof, are presumed to be the same as the common law of Kentucky; (4) appellants had the right under the contract to sell securities anywhere outside of Kentucky; (5) even as to sales of securities which may have been made in Kentucky appellants are entitled in any event to a commission of twenty per cent if they are not entitled to the full amount of the commission contracted to be paid, and (6) an affirmance of the judgment of the lower court would have the effect of permitting a party to take advantage of his own violation of law at the expense of an innocent party who has been guilty of no such violation.

For appellee, Creasey Corporation, it is contended (1) that the petition does not allege the appellants performed their part of the contract, or aver facts showing a sufficient excuse for nonperformance; (2) the petition does not state any fact sufficient to establish a renunciation of the contract by appellee; (3) there is no allegation of a breach of contract by appellee, at least none justifying its abandonment by appellants; (4) the contract was wholly void because the making of it was a criminal act under the express provisions of the statute, section 883e-23; (5) if it be conceded that the contract was voidable and not void, as contended by appellants, the court properly refused to enforce it because it is against public policy, and (6) there is no plea that would uphold a recovery upon an implied contract or upon *quantum meruit*.

We think it will only be necessary to consider a part of the contentions made by appellee to prove that the general demurrer was properly sustained.

The reasons assigned by the learned trial judge in his written opinion delivered at the time of sustaining the demurrer are quite forceful, and we are not prepared to say they are not altogether sufficient; but as we think there are other equally as good if not better grounds upon which the general demurrer may be sustained to the petition, we will refrain in this opinion from further discussing the contention of appellee that the contract was in derogation of a statute which carries a penalty, and was, therefore, void.

It will be observed that the petition alleges in general terms that the contract was breached by the Creasey Corporation, but we are of opinion that the averments of the petition upon this subject are insufficient to show a breach upon the part of the appellee. The allegation is that appellants "did effect an arrangement for the sale of a million dollars in par value of the said stock of defendant in blocks of $200,000.00 in par value, at intervals of three months, beginning June 20, 1922, and that a part of the stock subscribed therefor were accepted by the defendant but that defendant suddenly and without justification notified plaintiffs that they would no longer accept stock subscriptions under that arrangement and refused and demanded of plaintiffs that they discontinue such sale of stock. They state the defendant thereby violated the obligation of its contract and thereby prevented plaintiff from consummating the sale of said stock which would have been consummated by plaintiff but for the action of defendant in preventing its consummation and thereby defendant has deprived plaintiffs of their commission upon the sale of the stock." As the original contract between Philbin and the Creasey Corporation was attached to and made a part of the petition and its terms were at variance with the averments of the petition which we have just copied, the exhibit will prevail, and thus contradict and nullify the averments of the petition to that extent. The contract did not confer upon appellants the right or authority to sell the stock of the Creasey Corporation upon the terms and conditions alleged in the petition as amended. To the amended petition is attached the proposition of the Chicago concern, offering to purchase a million dollars

in par value of the stock of the Creasey Corporation in blocks of $200,000.00 at intervals of three months beginning June 20, 1922, and the terms of that proposition are so dissimilar to the terms of the contract under which the appellants undertake to sell the stock that they are wholly incompatible. The Chicago concern proposed to purchase the stock in blocks of $200,000.00 and not in units of three shares, as provided in the contract; the units of three shares were to be sold at the price of $325.00 and the first payment was fixed at $65.00; whereas, in the proposal of the Chicago concern the stock was to be purchased on the basis of $88.33 1/3 per share, par value $100.00, and the initial payment per share was to be $5.00, with the balance at rather long intervals thereafter.

As appellants' only right to sell the stock of the appellee corporation was obtained by and through the contract attached to the petition it was bound to carry out the sale of the stock, if at all, in accordance with the terms and conditions set forth in the contract and not otherwise. It had no right to sell the stock for less than par in violation of that contract, even though the sum actually realized by the Creasey Corporation from such sales was not less nor different from those specified in the contract, for it may have been greatly to the detriment of the Creasey Corporation to have its stock sold for less than par. Is that not self-evident? The statement of the facts would seem to authorize that conclusion. So, in averring that a sale of a million dollars par value of stock of the appellee corporation had been effected to a Chicago concern at the price of $88.33 1/3, appellants did not show that they had carried out the terms of the contract or had contracted for the sale of the stock in accordance with the terms of the contract, and it follows that the Creasey Corporation had the right to refuse to accept such a proposition and to decline to allow appellants to sell its stock on such terms. In other words, the averments of the petition did not show that the Creasey Corporation violated the terms of its contract when it refused to accept the proposition of the Chicago concern to purchase a million dollars, par value, of its stock at $88.33 1/3 per share, par value $100.00.

The averments of the petition and the provisions of the contract show that one, if not the sole, purpose of the sale of the stock and service contracts was to enlist the interest of more retail grocerymen and thus increase the

wholesale grocery business of the corporation. To accomplish this purpose it was necessary to sell the stock in small blocks and put it into the hands of as many retail merchants as possible. Manifestly, this object would not be accomplished but would be obstructed by the sale of $1,000,000.00, par value, of the stock to a single corporation not engaged in the grocery business, or at least not alleged to be so engaged.

It is insisted, however, that a second breach of the contract by appellee is charged in the second paragraph of the original petition wherein it is averred that the Creasey Corporation has, since the making of the contract with appellants, by authorizing and causing to be issued and sold a million dollars in gold notes of the company payable in ten years from their date and bearing interest at the rate of 8 per cent, and in which notes it is agreed that the corporation shall set aside a sinking fund out of the revenue derived from the discounts of bills of the corporation from which shall be paid to the holder of the note the interest thereon, and at the end of the term the principal sum plus $90.00; that this undertaking on the part of the Creasey Corporation renders it certain that the common stock of the corporation which appellants undertook to sell would not be dividend bearing and would not, therefore, be salable in the open market. It must be borne in mind that there is no averment in the petition as amended that the stock was or was not intended to be dividend bearing, or that it would earn a dividend, or that the prospects of dividends on the stock of the Creasey Corporation gave it a market value greater than it would otherwise have, or in any way added to its marketable qualities. In the absence of such averment the presumption would be that the stock was not dividend bearing, or at least there would be no presumption that it was dividend bearing, for the pleadings must be construed strongest against the pleader. Holman v. Kentucky Light & Power Co., 201 Ky. 267; Luther & Morgan v. Payne, Agt., 197 Ky. 359.

The Creasey Corporation had the right, so far as the contract upon which appellants rely is concerned, to issue other obligations than its stocks, bonds, securities and service contracts, and to sell them at any price it desired without let or hindrance from appellants, and the mere fact it decided to issue gold notes bearing 8 per cent interest to be paid out of the savings, effected through

the discount of bills, does not at all militate against the carrying out of the contract it made with appellants. As we understand it, the gold notes were to be sold for cash, and this cash, one million dollars, used by the Creasey Corporation in discounting its current bills for merchandise bought of manufacturers and jobbers, thus saving a per cent on each purchase. Without the money derived from the sale of the gold notes the Creasey Corporation would not have been able, we infer from the averments of the petition, to have discounted its bills and would not, therefore, have been able to have effected the proposed saving by discounting bills, hence there would have been no such saving and, therefore, no fund with which to pay dividends on stocks or to pay interest on gold notes or to liquidate such notes. Construing the averments of the petition as favorably to appellants as the language will permit, we are of opinion that no breach of the original contract is averred or shown by the second paragraph of the original petition.

Judgment affirmed.